IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SARAH FULLERTON, | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| POTTSTOWN HOSPITAL CORPORATION, | : | |
| et al. | : | No. 15-5329 |
| Defendants. | : | |

**MEMORANDUM OPINION**

**TIMOTHY R. RICE**                                                                                               **July 13, 2016**
**U.S. MAGISTRATE JUDGE**

   Sarah Fullerton has sued her former employer, Pottstown Hospital Corporation ("Pottstown"), for violating the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. ("ADA"), the Pennsylvania Human Relations Act, 43 P.S. § 951 et seq. ("PHRA"), and the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq. ("FMLA"). See Second Am. Compl. (doc. 18). She alleges Pottstown unlawfully discriminated against her and fired her because she is disabled and availed herself of FMLA leave. See id. She also contends Pottstown interfered with her right to take FMLA leave. See id.

   Pottstown seeks summary judgment. See Motion for S.J. (doc. 29). It argues Fullerton has failed to establish that her firing was based on her disabilities and taking FMLA leave. It also asserts that her FMLA interference claim fails because she cannot show she was denied any benefits to which she was entitled. I grant Pottstown's motion in part and deny it in part.

**I.      LEGAL STANDARD**

   Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a genuine issue of fact exists, I must resolve all factual doubts and draw all

reasonable inferences in favor of the nonmoving party. Ray v. Warren, 626 F.3d 170, 173 (3d Cir. 2010). Where there is only one reasonable conclusion from the record regarding the potential verdict under the governing law, summary judgment must be awarded to the moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). "If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." Id. at 250-51.

## II.   BACKGROUND

Fullerton was hired by Pottstown as a nurse in March 2013. See Joint Appendix ("JA") 516. Fullerton suffers from Crohn's disease, an inflammatory bowel disease, and fibromyalgia, a condition that causes pain and stiffness in the muscles and joints. JA 29, 34, 598-98; Dorland's Illustrated Medical Dictionary 539, 711 (32nd ed. 2012). Because of these conditions, there are days when she feels "horrible," "achy," and nauseous, and has leg pain. JA 34, 604. There is no evidence Fullerton informed Pottstown that she had those conditions when she was hired.

Under Pottstown's attendance policy, an employee incurs an incident of absence when she fails to report to work on any scheduled workday without approval. JA 431. An employee should receive a documented verbal counseling for two or more incidents of absence in her first 90 days of employment. JA 432. A written warning is warranted for a fifth incident of absence in a rolling 12-month period. JA 432. An employee is subject to a final written warning for a sixth incident of absence. Id. For seven or more incidents of absence in a rolling 12-month period, an employee is subject to separation. Id.

Under Pottstown's discipline and termination policy, it has discretion to administer disciplinary action depending on many factors, including the employee's prior disciplinary record, the seriousness of the misconduct, and the impact on others. JA 434. The policy also

discusses various progressive steps of discipline. JA 434-36. A supervisor should give and document verbal counseling sessions for minor infractions or initial performance or behavioral issues. JA 434. A supervisor should give a written warning for repetition of unacceptable behavior, more serious violations, and continuation of poor performance. Id. Second written warnings should be provided for repetition of unacceptable behaviors or performance. JA 435. Third written warnings should be used only for employees with attendance and performance issues and when the accumulation of those issues do not warrant suspension/termination. Id.

An investigative suspension may be used as an interim action while waiting for the outcome of an investigation. Id. A disciplinary suspension of one to five days without pay also may be imposed if unacceptable behavior or performance issues still occur after the issuance of written warnings or in the event of a serious violation of hospital policy. Id. An employee is subject to termination for repeated violations of hospital policy after receiving appropriate warnings and may be terminated immediately for serious violations or with continued poor performance. JA 436. Nevertheless, "[i]n most cases, a disciplinary suspension is required prior to termination unless the violation or behavior is egregious enough to warrant immediate termination." Id.

In August 2013, approximately five months after Fullerton started at Pottstown, she was evaluated and received consistent scores of three out of five, meaning she met expectations. See JA 448-59. In the comments, her supervisor, Susan Delaney, wrote Fullerton was a "new hire" and she was "hoping to see improvement but meets for time here." JA 450. She also noted Fullerton was having challenges catching on and seemed to be occasionally overwhelmed and perplexed. JA 458.

During the evaluation, Delaney discussed Fullerton's multiple absences, telling her not to get too comfortable at Pottstown because of those absences. JA 39. At this time, Delaney knew Fullerton suffered from Crohn's disease because Fullerton had told her when calling out sick once. Id. A few months later, in December 2013, Delaney issued Fullerton a verbal counseling for excessive absences. JA 446. She noted Fullerton had eight incidents of absence in her first nine months of employment. Id.

In January 2014, a different supervisor issued Fullerton a verbal counseling for failing to comply with hospital policy. JA 445. The supervisor noted Fullerton had given a patient the wrong dose of medication. Id. In March 2014, Fullerton's new supervisor, Wendy Wickward, issued Fullerton a written warning for failing to comply with hospital policy. JA 444. Wickward noted that Fullerton had written down the wrong medication on a patient's chart. Id.

In April 2014, Fullerton incurred another incident of absence. JA 443. A Pottstown human resources employee emailed Wickward, explaining Fullerton now had nine incidents of absence in a rolling 12-month period and should receive a written warning.[1] JA 634. The next day, Wickward issued Fullerton a written warning for excessive absences. JA 443. In the remarks section, Fullerton stated life happens, but she would attempt to work all of her scheduled shifts for the next three months. Id. Fullerton initially did not think she told Wickward at this time any particular reasons why she had been absent. JA 52. However, she later said she had told Wickward that her Crohn's disease was the reason for two or three of her absences.[2] JA 83;

---

[1] The human resources employee also noted that for "future absentees," Wickward should give a verbal counseling for five absences, a written warning for six absences, a second written warning for seven absences, and a final written warning or termination for eight absences. JA 634.

[2] Similarly, although Fullerton initially said she could not recall a specific medical reason

JA 56-57 (Fullerton told Wickward about her Crohn's disease some time earlier than September 2014).

In July 2014, Fullerton had an annual evaluation, and again received consistent scores of three out of five. JA 208-18. Wickward noted Fullerton was a friendly and patient-centered nurse who had a lot of potential to become a shining star. JA 218. She stated Fullerton needed to be more detail-oriented as she had two disciplinary actions for medication errors. JA 218.

In early August 2014, Wickward issued Fullerton a second written warning for failing to comply with hospital policy. JA 442. She noted Fullerton did not notify a supervisor or doctor that a patient had fallen, and she did not complete an incident report. Id.

In late August 2014, Fullerton incurred another incident of absence. JA 441. Fullerton could not recall why she was absent on this date. JA 56. On September 8, 2014, Wickward issued Fullerton a second written warning for excessive absences.[3] JA 441. Wickward noted Fullerton now had six incidents of absence in a 12-month rolling period; she did not count any absences outside the 12-month period. Id. In the remarks section, Fullerton stated, "Please give exact dates when I can take a sick day without being penalized." Id.

In late September 2014, Fullerton took an approved three-week vacation to visit family. JA 58. Fullerton returned to work on October 25, 2014, but called out sick the following day because of an upper respiratory infection. Pottstown's Statement of Undisputed Facts (doc. 29-1) ¶ 35; Pl.'s Resp. to Statement of Facts (doc. 30-1) ¶ 35. On October 30, 2014, Fullerton's

---

for any of her absences, she later said one absence was for an OB/GYN appointment and "[t]here were [other] times" she was absent because she was vomiting. JA 48-49.

[3] On the same day, a human resources employee emailed Wickward that a second written warning was appropriate for Fullerton's absences, and that Fullerton could receive a third written warning before being terminated. JA 635.

next scheduled work day, Fullerton called Wickward and said she was still not feeling well and unable to work. See Pottstown's Statement of Undisputed Facts ¶ 36; Pl.'s Resp. to Statement of Facts ¶ 36. Wickward told Fullerton to call human resources to discuss obtaining FMLA leave. JA 63. Fullerton contacted human resources and the hospital's FMLA administrator and was deemed eligible for FMLA leave until November 9, 2014 if she provided a medical certification by November 15, 2014.[4] JA 466.

While Fullerton was on FMLA leave, Wickward called Fullerton approximately three or four times to ask when she would be returning to work. See Pottstown's Statement of Undisputed Facts ¶ 42; Pl.'s Resp. to Statement of Facts ¶ 42. Fullerton told Wickward she would consult her doctor in early December. JA 66. However, after another call from Wickward, Fullerton contacted her doctor's office and said she could return to work on November 24, 2014. JA 66.

On November 14, 2014, Fullerton's doctor certified Wickward was unable to work from October 30, 2014 until November 24, 2014.[5] JA 468-69. The doctor explained that Fullerton was experiencing two issues: (1) treatment and absence for bronchitis; and (2) a flare up of her "chronic condition" of Crohn's disease. Id. at 469. The doctor additionally noted that flare ups of Fullerton's condition may require her to miss work one to two times per month. Id. Based on

---

[4] On October 30, 2014, a human resources employee also emailed Wickward noting Fullerton now had six incidents of absence and a final written notice was due. JA 640. The record, however, does not show that Fullerton was issued a final written notice for excessive absences.

[5] On the same date, Fullerton completed an FMLA request form seeking FMLA leave from October 30, 2014 until December 1, 2014, and Wickward signed and granted that request. JA 636.

this certification, the hospital's FMLA administrator approved Fullerton's FMLA from October 30, 2014 until November 23, 2014. JA 641.

Fullerton returned to work on November 24, 2014, and was capable of performing her work duties. JA 70, 74. Although Wickward had been friendly and helpful to Fullerton before she went on FMLA leave, Wickward suddenly became unfriendly.[6] JA 44-45, 73-77.

On the morning of December 4, 2014, Fullerton was working on a different floor for a different supervisor, Brittany Nazzaro. See Pottstown's Statement of Undisputed Facts ¶¶ 51-52; Pl.'s Resp. to Statement of Facts ¶¶ 51-52. Nazzaro determined Fullerton had delayed transferring a patient to the Intensive Care Unit after an order was issued. JA 305-06. Fullerton, however, testified that doctors told her to wait on transferring the patient until a bed was ready. JA 72-73. Nazarro also testified she saw Fullerton walk pass a patient's bathroom call light, which was a signal for help. JA 313. Nazzaro informed Wickward about these incidents and questioned Fullerton's competency. JA 305, 394.

During the late afternoon of December 4, Fullerton returned to her regular floor. JA 82. She noticed one patient was nonresponsive. JA 80. The previous nurse and the patient's aide informed Fullerton that the patient had been in that condition since the prior night. JA 80-81. Shortly later, the patient's family called and asked if the patient had received medication. Id. Because Fullerton did not see the medication on the patient's chart, she called her supervisor, Kathi Weaver. Id. After checking with another department, Weaver informed Fullerton that the patient had received the medication. Id. The patient's family then asked to speak to Weaver. Id. Fullerton again called Weaver, who came to the room and told Fullerton she could leave. Id.

---

[6] Fullerton also contends Wickward failed to help her in reactivating her computer access when she returned. See JA 45. Wickward, however, initiated a request to reactivate Fullerton's computer privileges the date she returned to work. JA 488.

at 81. Fullerton, therefore, left the room and gave a report about the situation to the nurse who was taking over. Id.

On December 5, 2014, Wickward emailed Nazzaro, stating: "I am doing paper trail on Sarah Fullerton. Please write up her blunder down there for the other day." JA 646. Nazarro prepared a third written warning for Fullerton for failure to comply with hospital policy, noting Fullerton's delayed transfer of the patient and walking past a bathroom call light. JA 440.

On the same day, Weaver also created a "complaints and grievances report" regarding the December 4 afternoon incident. JA 506-507. She noted that a patient's family had complained that Fullerton was not properly caring for the patient and would not speak to them about the patient's care. JA 507. Weaver further noted that after she arrived in the room, Fullerton left without assisting with information regarding the patient. Id.

After receiving this information, Wickward emailed her boss, Tammy Straub. JA 653. Wickward said she had "enough documentation and [a human resources employee's] blessing to dismiss [Fullerton]. I know it is very close to the holidays but she has now put people in jeopardy." JA 653. She then listed the two December 5, 2014 incidents, the December 2013 medication error, the March 2014 medication error, the April 2014 verbal warning for excessive absences, and the September 2014 written warning for excessive absences. Id.

On December 8, 2014, Wickward prepared a termination notice for Fullerton for substandard work, failure to comply with hospital policy, and unprofessional conduct. JA 647. Wickward noted Fullerton used poor judgment in customer service and poor critical thinking skills in response to a complaint from a patient's family. Id. Wickward and Weaver notified Fullerton of her termination during a December 11, 2014 in-person meeting. JA 83, 389.

Wickward and Weaver discussed all of Fullerton's prior disciplinary actions.[7] JA 85-87. Wickward then said, "And then you're out sick all these – you know, every couple of weeks, you're absent." JA 87-88.

During the time Fullerton worked for Wickward, Wickward disciplined several other employees. Two other employees received three or more warnings. Between March 2014 and September 2015, Wickward issued Karen Harvey two verbal counselings for missing doctor orders and two written "first warnings," one for improperly providing a patient with a second dose of medication and a second for complaints by a patient's family member.[8] JA 474, 476, 477, 502. Between April 2014 and January 2016, Wickward issued Tina Fisher four verbal counselings, two for patient complaints,[9] one for not following hospital policy on catheters, and one for looking up patient medical records. JA 484, 485, 490, 495.

## III. DISCUSSION

### A. Fullerton's ADA and PHRA Discrimination Claims

#### 1. Prima Facie Case

The ADA and PHRA prohibit employers from discriminating against individuals based on their disabilities. 42 U.S.C. § 12112(a); 43 P.S. § 955. To establish a prima facie case of discrimination under the ADA and PHRA, Fullerton must show: (1) she is disabled; (2) she is

---

[7] In response, Fullerton explained that she had followed doctors' orders in not immediately transferring the patient on the morning of December 5. JA 440. She also said she left the patient's room on the afternoon of December 5 because Weaver told her to leave. JA 86.

[8] The patient's daughter complained that Harvey incorrectly told the patient she was going to be moved for an irregular heart beat and that she would obtain an antibiotic at 1 a.m. JA 502.

[9] One patient complained that Fisher ripped his dressing, causing an abrasion, told him she did not have time to deal with the issue, and threw paper towels at him. JA 484. Fisher denied this happened. Id. Another patient complained that Fisher told the patient to remind Fisher about giving medications. JA 485.

qualified to perform the essential functions of the pertinent job, with or without reasonable accommodations by the employer; and (3) Pottstown took an adverse employment action against her because of the discrimination. See 42 U.S.C. § 12112(a); 43 P.S. § 955(a); see also Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999); Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996) (PHRA claims are analyzed in same manner as ADA claims).

For purposes of this motion, Pottstown disputes only the element of causation with respect to Fullerton's burden of establishing a prima face case of discrimination. See Bf. in Support of S.J. (doc. 29-2) at 27 ("Fullerton's discrimination claim fails for want of causation."). Fullerton, however, asserts there is direct evidence of causation based on Wickward's statement that she was being fired, in part, because she was out sick and absent every couple of weeks.

"[D]irect evidence of discrimination is overt or explicit evidence that is so revealing of a discriminatory animus that no presumptions or inferences are needed." Eastman v. Research Pharmaceuticals, Inc., No. 12-2170, 2013 WL 3949236, at *10 (E.D. Pa. Aug. 1, 2013) (citing Tolan v. Temple Health Sys. Transp. Team, Inc., No. 09-5492, 2013 WL 706049, at *n.7 (E.D. Pa. Feb. 26, 2013)). Such evidence "must demonstrate that decision makers placed substantial negative reliance on an illegitmate criterion in reaching their decision." Jakimas v. Hoffman-La Roche, Inc., 485 F.3d 770, 786 (3d Cir. 2007) (internal citations omitted).

Wickward's alleged statement that Fullerton was being fired for being "out sick" and "absent" is not "so revealing of a discriminatory animus that no presumptions or inferences are needed." Eastman, 2013 WL 3949236 at *10. Being fired for being absent, even if the absences are related to being sick, is not direct proof that an employee was fired for her disability. See Munoz v. Nutrisystem, Inc., No. 13-4416, 2014 WL 3765498, at *n.5 (E.D. Pa. July 30, 2014) ("Because the termination was premised on attendance, however, not on her disabilities directly,

10

Munoz's argument does require an inference of discriminatory animus."). Further, although Wickward referred to Fullerton being "out sick," Fullerton called out sick for reasons other than her Crohn's disease and/or fibromyalgia. See JA 48-49 (she missed work because she fainted at an OB/GYN appointment), supra at 6 (she was out sick for an upper respiratory infection). Thus, Wickward's reference to Fullerton being "out sick" is not necessarily a direct reference to Fullerton's Crohn's disease.

Nevertheless, Fullerton argues that she also can establish causation based on circumstantial evidence, including: (1) Wickward's statement that she was being fired for being "out sick" and "absent;" (2) this statement was made and Fullerton was fired 17 days after she returned from FMLA leave based on her Crohn's disease; (3) Delaney and Wickward failed to excuse or provide an accommodation for Fullerton's absences that they knew were based on her Crohn's disease; (4) Wickward failed to issue Fullerton a disciplinary suspension, probation or performance improvement plan before terminating her; and (5) Wickward treated other non-disabled employees, who engaged in similar or more egregious conduct, more favorably than Fullerton by not issuing them progressive disciplinary action. See Pl.'s Br. in Opposition to S.J. Motion (doc. 30) at 13.

A jury could reasonably infer from this evidence that Fullerton was fired because of her disability. See Anderson v. Wachovia Mortgage Corp., 621 F.3d 261, 270-71 (3d Cir. 2010) ("[t]he burden of establishing a prima facie case of disparate treatment is not onerous") (citing Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)); see also Eastman, 2013 WL 3949236 at *11 (although "Eastman has not produced substantial circumstantial evidence, based on the light burden of establishing a prima facie case, Eastman has presented sufficient evidence of a prima facie case to preclude summary judgment").

### 2. Evidence of Pretext

Pottstown next argues that even if Fullerton can establish a prima facie case of discrimination, her claims must be dismissed because it has articulated legitimate, non-discriminatory reasons for her discharge, and she has failed to show those reasons are a pretext for discrimination.

Once an employee has established a prima facie case of discrimination, the burden shifts to the employer to present "legitimate non-discriminatory reasons" for its actions. Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500 (3d Cir. 1997). This burden is "relatively light: it is satisfied if the defendant articulates any legitimate reason" for the adverse employment action. Id. at 500-01 (citing Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997)). If the employer meets this burden, the employee must show that the employer's proffered reason is solely a pretext for discrimination. See id.; Abramson, 260 F.3d at 283. The employee "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not . . . a determinative cause of the employer's actions." Eastman, 2013 WL 3949236 at *12 (citing Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994)). The plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted nondiscriminatory reasons." Id. (citing Fuentes, 32 F.3d at 765).

Pottstown alleges Fullerton was terminated because she "amassed five serious, performance-based disciplinary infractions in the course of a single year." Pottstown's Br. at 16.

Fullerton contends there is "an abundance of evidence" to establish that these reasons are a pretext for discrimination. Fullerton's Br. at 16. In addition to the circumstantial evidence she cited in support of her prima facie case, Fullerton cites the following as proof of pretext: (1) Wickward's counting medical absences against Fullerton; (2) Wickward's sending an email to her boss indicating her desire to terminate Fullerton for performance and attendance reasons; (3) Wickward's deposition testimony that Fullerton was terminated solely for performance reasons; (4) Wickward's good review of Fullerton less than six months before she was terminated; and (5) Wickward's failure to investigate the December 5 incidents. Id. at 16-17.

Because Fullerton cites evidence that demonstrates weaknesses, implausibilities, and inconsistencies in Pottstown's reasons for terminating her, a reasonable jury could conclude Fullerton's disability was a factor in Pottstown's termination decision.[10] First, viewed in the light most favorable to Fullerton, the evidence shows that both Delaney and Wickward knew some of Fullerton's absences could be related to her Crohn's disease. Nevertheless, they disciplined her for these absences instead of offering her an accommodation. See infra at 15-16 (Fullerton's notification about her Crohn's could be deemed a request for a reasonable accommodation). Second, Wickward's alleged reference to Fullerton being out sick during the termination meeting with Fullerton suggests Wickward did not fire Fullerton for solely performance-based reasons, as she later testified, see JA 388. Further, a jury could infer Wickward was referring to Fullerton's Crohn's disease when making this statement because

---

[10] Pottstown argues Fullerton's claims of pretext fail because she "does not even attempt to contest the truth or legitimacy of [its] performance-related justification." Pottstown's Reply Br. (doc. 31) at 21. However, an inquiry into the underlying merits of employment decisions is irrelevant in most cases. See Capps v. Mondelez Global LLC, 14-04331, 2015 WL 7450539, at *7 (E.D. Pa. Nov. 25, 2015) ("[T]he question is not whether [the employer's] decision was wrong or mistaken but whether [the employer] acted with discriminatory animus.") (citing Parker v. Verizon Pennsylvania, Inc., 309 F. App'x. 551, 557 (3d Cir. 2009)).

Fullerton had recently returned from FMLA leave due to her Crohn's.  A jury also could conclude Wickward treated other similar employees without disabling conditions, such as Karen Harvey and Tina Fisher, more favorably because they did not receive progressive discipline for performance violations like Fullerton's.  See supra at 9-10.  Additionally, a jury could question the validity of Pottstown's decision to terminate Fullerton without conducting any investigation, particularly as the hospital's termination policy allowed for investigative suspensions and encouraged issuing a disciplinary suspension before firing an employee.  See supra at 3.

Accordingly, there is a genuine issue of material fact as to whether Fullerton's disability was a determinative factor in Pottstown's decision to terminate her.  Summary judgment is denied on Fullerton's discrimination claims.

      **B.**      **Fullerton's ADA and PHRA Retaliation Claims**

To establish a prima facie case of retaliation under the ADA and PHRA, Fullerton must show: (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) there was a causal connection between her protected activity and the adverse employment. See Krouse, 126 F.3d at 500; see also Shaner v. Synthes, 204 F.3d 494, 500 (3d Cir. 2000) (burden shifting framework applied in discrimination claims also applies in retaliation claims).

Pottstown argues that Fullerton's ADA and PHRA claims fail because she cannot show she engaged in protective conduct or she was terminated for any such conduct.  Pottstown's Br. at 10 n.2.  Fullerton, however, asserts she engaged in protective conduct by requesting a reasonable accommodation to perform work with her disabilities.  See Second Am. Compl. ¶ 25; Fullerton's Br. at 17-18.

Fullerton contends she sought a reasonable accommodation when she requested FMLA leave.  Fullerton's Br. at 19.  An employee may request for FMLA leave, or up to 12 workweeks

of medical leave, when she has a serious health condition that prevents her from performing the functions of her job.  See 29 U.S.C. § 2612(a)(1).  Alternatively, "an employee that requests a reasonable accommodation under the ADA is signaling that he 'can perform the essential functions of the employment position'" with the requested accommodation.  Capps, 2015 WL 7450539 at *9 (citing 42 U.S.C.A. § 12111).  Thus, Fullerton's request for FMLA leave did not constitute a request for an accommodation under the ADA.  See id. (citing Rutt v. City of Reading, 13-4559, 2014 WL 5390428 (E.D. Pa. October 22, 2014)).

       Fullerton also argues that she sought a reasonable accommodation when she notified Delaney and Wickward that she had been absent on earlier dates because of her Crohn's disease.  An employee does not need to mention the ADA or use the phrase "reasonable accommodation" to request such an accommodation.  Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 313 (3d Cir. 1999).  An employee "nonetheless must make clear that [she] wants assistance for [her] disability."  Id.  Thus, "the employer must know of both the disability and the employee's desire for accommodations for that disability."  Id.

       Here, Fullerton testified she told both Delaney and Wickward that she suffered from Crohn's disease when she called out sick.  JA 39, 83.  Moreover, after being disciplined for excessive absences in September 2014, Fullerton asked when she could take a sick day without being penalized.  JA 441.  A reasonable juror could conclude from this evidence that Fullerton sufficiently requested a reasonable accommodation in the form of intermittent excused sick time.  See Lowenstein v. Catholic Health E., 820 F. Supp. 2d 639, 647 (E.D. Pa. 2011) (request for extra "sick time" could be deemed a request for a reasonable accommodation).  Further, such a request constitutes protected activity under the ADA.  See Munoz, 2014 WL 3765498 at *7 ("[r]equesting reasonable accommodations is a protected activity under the ADA").

15

Fullerton also contends there is circumstantial evidence that Pottstown terminated her because of her requests for an accommodation because: (1) it disciplined her for her absences related to her Crohn's disease instead of offering her an accommodation; and (2) it considered these absences in terminating her, as shown by Wickward's December 5 email to Straub, which mentioned her absences, and by Wickward's statement that she was being fired because she was out sick and absent every couple of weeks.  Fullerton's Br. at 22.  Such evidence is sufficient to establish a prima facie case of causation.  See supra at 12.  Further, although it is a close question, a reasonable jury could conclude based on this evidence, as well as the other evidence cited by Fullerton, see supra at 13-14, that Pottstown had a retaliatory animus.  See supra at 13; Krause, 126 F.3d at 501 (employee "must prove that retaliatory animus played a role in the employer's decisionmaking process and that it had a determinative effect on the outcome of that process").

Summary judgment is denied on Fullerton's ADA and PHRA retaliation claims.

### C.    Fullerton's FMLA Retaliation Claim

When an employee invokes her FMLA rights, an employer may not "discharge or in any other manner discriminate against" that employee for invoking such rights.  29 U.S.C. § 2615(a)(2); see also 29 C.F.R. § 825.220 ("employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions").  "To prevail on a retaliation claim under the FMLA, the plaintiff must prove that (1) she invoked her right to FMLA-qualifying leave, (2) she suffered an adverse employment decision, and (3) the adverse action was causally related to her invocation of rights."  Lichtenstien v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 301-02 (3d Cir. 2012); see also id. (FMLA claim is analyzed like employment discrimination claim).

For purposes of this motion, Pottstown concedes Fullerton was protected by the FMLA and suffered an adverse employment action. See Pottstown's Br. at 10. Pottstown, however, contends Fullerton cannot show that her FMLA request caused her termination. See id. It notes that three of Fullerton's five disciplinary actions were issued before she ever sought or took FMLA leave. See id. at 17. It also contends that Fullerton's final disciplinary action was based on evidence submitted by supervisors who were unfamiliar with Fullerton and did not know about her FMLA leave. See id. at 18-19. Although such evidence suggests Pottstown fired Fullerton for performance-based reasons, there is evidence from which a reasonable juror could conclude that Pottstown's actions also were motivated by Fullerton's request for leave. See Lichenstein, 691 F.3d at 301 ("[A]n employee does not need to prove that invoking FMLA rights was the sole or most important factor upon which the employer acted.").

In addition to the evidence Fullerton previously cited to show causation, Fullerton asserts that Pottstown fired her based on her FMLA request because: (1) she was fired within 17 days of returning from FMLA leave; (2) Wickward called her multiple times while she was out on FMLA leave asking when she would return; and (3) Wickward was antagonistic to her after she returned from FMLA leave. See Fullerton's Br. at 31. I agree that this evidence sufficiently raises a question of material fact as to whether Pottstown's reasons for firing Fullerton were partially false because Fullerton's FMLA leave was a "negative factor" that hastened her termination. See 29 C.F.R. § 825.220(c); Lichenstein, 691 F.3d at 311 (although employee engaged in behavior that warranted her firing, other evidence, such as the timing of the firing and the employee's FMLA request and inconsistencies in the employer's testimony, were sufficient to show the FMLA request was also a factor in the firing).

Summary judgment is denied on Fullerton's FMLA retaliation claim.

**D.    Fullerton's FMLA Interference Claim**

The FMLA also makes it unlawful for "an employer" to "interfere with, restrain, or deny" an employee's right to take FMLA leave. 29 U.S.C. §§ 2601(b)(2), 2615(a)(1). To establish an inference claim, Fullerton must show: (1) she was eligible for FMLA leave; (2) she gave appropriate notice of her need for leave; and (3) she was denied leave to which she was entitled under the FMLA. See Ross v. Gilhuly, 755 F.3d 185, 192 (3d Cir. 2014); Callison v. City of Phila., 430 F.3d 117, 119-20 (3d Cir. 2005); see also 29 C.F.R. § 825.220(b) ("Interfering with the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave.").

Fullerton argues Pottstown interfered with her right to take FMLA leave by: (1) failing to offer her FMLA leave before October 2014 or designate absences due to her Crohn's disease as FMLA leave; (2) failing to code her October 30 and 31 absences as FMLA leave; and (3) harassing her when she was on leave and when she returned. See Fullerton's Br. at 28-30. Pottstown only contests Fullerton's claim that Wickward harassed her by calling her when she was on FMLA leave. See Pottstown's Br. at 4-9. It contends Fullerton cannot establish that such conduct interfered with her FMLA rights because it did not cause her to be denied any FMLA benefits to which she was entitled. I agree.

Although Fullerton contends Wickward's telephone calls pressured her to return to work earlier than the expiration of her leave, the evidence shows she was no longer entitled to FMLA leave as of the date she returned. Fullerton's doctor certified that the end date for Fullerton's FMLA leave was November 24, 2014, the day she returned to work. JA 469. Fullerton also

18

testified that she was capable of performing her duties as a nurse on that date.[11]  JA 70.  Given this evidence, Fullerton cannot claim that she was denied benefits to which she was entitled by returning to work on November 24.  See 29 U.S.C. § 2612(a)(1) (FMLA leave allowed for serious medical condition that "makes employee unable to perform the functions of the position of such employee").  Summary judgment, thus, is granted on Fullerton's claim that Pottstown interfered with her FMLA rights by harassing her while she was on FMLA leave.  See Capps, 2015 WL 7450539 at * 1 (granting summary judgment on FMLA interference because employer did not deny employee any benefits to which he was entitled under the statute).   However, because Pottstown does not contest Fullerton's other claims of FMLA interference, those claims remain.

      An appropriate order follows.

---

[11]  Although Fullerton also completed a FMLA request seeking leave until December 1, 2014, her doctor's certification and testimony show she was able to return to work earlier.  JA 636.